CAMARGO CORREA METAIS, S.A., PLAINTIFF *v.* UNITED STATES, DEFENDANT, AND AMERICAN ALLOYS, INC., GLOBE METALLURGICAL, INC., SILICON METALTECH, INC., AND SIMETCO INC., DEFENDANTS-INTERVENORS

Consolidated Court No. 91–09–00641

(Dated August 13, 1993)

*Rogers & Wells, (William Silverman, Ryan Trainer, Douglas J. Heffner)* for plaintiff Camargo Correa Metais.

*Royal Daniel III, (Royal Daniel III, Jeri Beth Katz)* for plaintiffs Companhia Brasileira Carbureto De Calcio, Rima Eletrometalurgia, S.A., and Ligas De Aluminio, S.A.

*Frank W. Hunger,* Assistant Attorney General; *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; *(Reginald T. Blades, Jr.)* for defendant.

*Baker & Botts, (William D. Kramer, Charles M. Darling, Martin Schaefermeier)* for defendants-intervenors.

OPINION

MUSGRAVE, *Judge:* Confidential material appears in the confidential version of this opinion in brackets, and is deleted from the public version of the opinion.

In this consolidated action, plaintiffs Camargo Correa Metais, S.A. ("CCM"), Companhia Brasileira Carbureto De Calcio ("CBCC"), Rima Eletrometalurgia, S.A. ("Rima") and Ligas De Aluminio S.A. ("Liasa") challenge the final determination of the ITA announced in *Final Determination of Sales at Less Than Fair Value: Silicon Metal From Brazil,* 56 Fed. Reg. 26,977 (1991). The International Trade Administration ("ITA") determined dumping margins for CCM of 93.20%; for CBCC, 87.79%; and for all others, 91.06%; *ad valorem. Id.* at 26,987. CCM and CBCC exported over 60% of the product under investigation during the period of investigation. During the investigation, CCM and CBCC received questionnaires from the ITA, and Rima filed a voluntary response. Liasa did not submit a voluntary response.

CCM has filed briefs on its own behalf, and CBCC and the other plaintiffs have jointly filed briefs on their behalf. Defendant-intervenors

American Alloys, Inc., Elkem Metals Company, Globe Metallurgical, Inc., Simetco, Inc., and SKW Alloys, Inc. have jointly filed a brief in opposition to plaintiffs' motions.

The ITA determined that CCM's and CBCC's home market sales were at less than the cost of production ("COP") and therefore resorted to constructed value ("CV") to determine foreign market value ("FMV"). The case centers upon the ITA's calculation of COP and CV. Many of the issues address the allocation of costs in Brazil's hyperinflationary economy, which during the period of investigation experienced inflation rates greater than 80% per month. In order to account for the high inflation, the ITA calculated separate COP's and CV's for each month of the period of investigation, based on current replacement costs, rather than historical costs, for inputs. *Id.* at 26,979.

CBCC takes issue with the ITA's replacement cost methodology, and argues that the ITA was required to utilize the generally accepted accounting procedures ("GAAP") of Brazil to account for hyperinflation when determining CBCC's COP.

In response, the ITA points out that 19 U.S.C. § 1677b(b) (1988) and related statutes contain no Congressional instruction on how the ITA should determine the COP. Therefore, under *Chevron,* Congress delegated the elucidation of a method for making this determination to the discretion of the ITA. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.* 467 U.S. 837, 844–845, 104 S. Ct. 2778, 2782, 81 L. Ed. 2d 694, 703 (1984).

The ITA has looked to the legislative history of § 1677b in forming its interpretation of whether COP should be determined using the GAAP of the home market. *Defendant's Memorandum In Opposition To Plaintiffs' Motions For Judgment Upon The Administrative Record,* at 25. The Committee Report on the legislation states in part,

> in determining whether merchandise has been sold at less than cost, [Commerce] will employ accounting principles generally accepted in the home market of the country of exportation if [Commerce] is satisfied that such principles reasonably reflect the variable and fixed costs of producing the merchandise.

H. Rep. No. 571, 93rd Cong. 1st Sess. 71 (1973). Based on this legislative history, the ITA concludes that "[i]f Commerce is not satisfied that the GAAP of the country under investigation reasonably reflect all of the costs of production, then Commerce need not employ those GAAP in its determination of COP." *Defendant's Memorandum In Opposition,* at 25–26.

This Court may not substitute its own construction of § 1677(b)(b) for a reasonable interpretation made by the ITA. *Chevron,* 467 U.S. at 844. The Court finds the ITA's interpretation of when to use the GAAP of the home market country to determine COP is reasonable.

CBCC alleges that the ITA failed to comply with the ITA's own interpretation because it made no finding that the GAAP of Brazil does not

reasonably reflect all the costs of production. CBCC is mistaken. The final determination states,

> Brazilian GAAP adjusts for inflation by use of the monetary correction. However, the monetary correction is an aggregate inflation adjustment to restate owner's equity and permanent assets. The monetary correction does not specifically relate to the product, nor to the POI [Period of Investigation], and thus, it would be distortive to apply this adjustment to the product. Because the Department determined that Brazilian GAAP does not reasonably reflect the costs of producing silicon metal in Brazil, the Department followed its longstanding practice to use replacement costs in hyperinflationary economies.

*Final Determination of Sales at Less Than Fair Value: Silicon Metal From Brazil*, 56 Fed. Reg. at 26,986.

If the finding that Brazilian GAAP does not reasonably reflect the cost of production is supported by substantial evidence on the record, then the ITA's rejection of those procedures must be affirmed. CBCC alleges that the finding is not so supported.

Brazilian GAAP uses an adjustment at the end of the accounting period called "monetary correction of the balance sheet" to adjust for changes in the purchasing power of the currency, using an index of devaluation recognized by Brazilian authorities. P.R. Document 143, at 2,384. To avoid twice accounting for the effects of inflation on costs, "inventory costing (for purposes of cost of goods sold) by law must be at the historical value, not replacement cost or indexed cost, since the difference in timing between the recognition of the cost and the recognition of the receipt is captured by the accounting system at year's end in the monetary correction of the balance sheet." P.R. Document 143, at 2,385.

Commerce ordinarily determines the costs of production by using actual historical costs. *Defendant's Memorandum In Opposition,* at 30, *See, e.g., Final Determination of Sales at Less Than Fair Value: Color Picture Tubes from Japan,* 52 Fed. Reg. 44,171, 44,175 (1987). However, in a hyperinflationary economy, historical costs that are not adjusted for inflation are not useful. *See AICPA International Accounting Standard No. 29.02 (1989).* With inflation in Brazil of more than 80% per month during the period of investigation, a difference in the date of purchase of only a few days can make a large difference in the price in Cruzeiros of an input material, even though the price adjusted for inflation or in terms of a stable currency may be nearly the same.

In assessing whether home market sales are at less than the cost of production, the ITA must determine whether "sales are not at prices which permit recovery of all costs within a reasonable period of time in the normal course of trade * * *." 19 U.S.C. § 1677b(b). The ITA correctly points out that for all costs to be recovered in the normal course of trade, home market prices must be sufficient to recover the cost of replacing the materials used to manufacture the product.

The Court therefore concludes that it is reasonable to require the restatement of historical costs to account for inflation between acquisition and the date of sale. While this need not require the submission of all costs on a replacement cost basis in general,[1] it is reasonable to require the submission of replacement costs if adjusted historical costs do not accurately reflect replacement costs.

The department requested CBCC to submit monthly COP data on a replacement or current cost basis. CBCC responded by submitting its historical cost data, adjusted for "payment terms" by dividing by one plus the inflation rate to reflect a cost as if purchased "at sight" without credit terms. *CBCC Verification Report,* C.R. Document 209,[2] at 349.

The record reveals that the historical and adjusted historical costs submitted by CBCC are substantially different from replacement costs for the same materials. For example, [                                          ]
*CBCC Verification Report,* C.R. Document 77 at 2265; *CBCC Verification Exhibit 12.* Therefore, the Court concludes that the finding that Brazilian GAAP does not reasonably reflect the costs of producing silicon metal in Brazil is supported by substantial evidence in the record.

The differences between the replacement cost method used by the ITA and the monetary correction appear to arise from the difference in the purposes for which each is intended. The monetary correction is designed to permit a company's annual financial statements to usefully reflect the company's financial performance for the year, and is not well suited to assessing the cost of production during a limited period of investigation. The replacement cost method used by the ITA is better adapted to the cost of production analysis.

CBCC next argues that the ITA failed to correctly account for inventory holding gain or loss in calculating the COP. The ITA described its action and rationale thus:

> CBCC's methodology for calculating inventory holding gain or loss did not take into account the quantity of inventory on-hand. CBCC's calculation methodology compared average stock prices to the average price of purchases. Accordingly, CBCC's methodology did not reflect the holding gain or loss for the period of investigation. For the Final Determination, the Department calculated an incremental monthly inventory holding gain or loss on finished goods and materials inventory using the available data for five months of the POI [period of investigation]. An average gain or loss

---

[1] It is not true, as the government suggests, that historical costs can never provide an accurate COP in a hypeinflationary economy. Historical costs, adjusted for inflation by an inflation index, can accurately reflect costs current at the time of sale if the cost of material inputs do not vary relative to the index. If a comparison of replacement costs with restated historical costs shows them to be substantially the same, use of the restated historical costs would "reasonably reflect the cost of production." However, it has been noted that relative prices tend to become unstable during hyperinflations, making the availability of such an index unlikely. *See* Samuelson and Nordhaus, *Economics* 313 (13th ed., McGraw Hill 1989).

[2] "C.R. Document" refers to a document in the confidential record. "P.R. Document" refers to a document in the public record.

for each month was calculated based on the total gain/loss divided by the five-month cost of manufacturing.

CR Document 89, at 2746.

CBCC's brief does not address the accuracy of its own method of inventory gain accounting, and the Court holds the ITA's refusal to use CBCC's method because it "did not correctly value the layers of inventory," was reasonable. *Final Determination: Silicon Metal From Brazil,* 56 Fed. Reg. at 26,987, Comment 43.

CBCC argues th at the ITA should have calculated inventory holding gain or loss only when an item from inventory was used, and not on a monthly basis. However, it does not appear that CBCC's own accounting methods did so, nor does CBCC indicate how it would perform such calculations. While the ITA's method is an approximation, it is a reasonable one, and it is affirmed.

CBCC next takes issue with the ITA's refusal to discount invoice amounts for payment terms. Some invoices allowed for payment after the date of invoice, and the invoice price was increased by an allowance for the inflation expected to occur during the period allowed for payment. CBCC discounted the amounts of those invoices to reflect "at sight" costs. The ITA refused to utilize CBCC's discounted costs, and used the invoice amount for replacement cost notwithstanding the fact that payment was not due until the next month. The ITA reasoned,

> CBCC then has the benefit of earning income on the cash for the period of the delay in payment. The COP is reduced by the amount of this short-term income. CBCC's contention that the Department should further reduce COP by the amount of the delay in payment would constitute double counting of the benefits from the delay in payment.

*Final Determination: Silicon Metal From Brazil,* 56 Fed. Reg. at 26,986, Comment 39.

CBCC cannot both have the invoice amount in cash to invest during the period for payment allowed by the terms of an invoice, and at the same time account for that invoice as if it were paid on the date of invoice. CBCC fails to address this point entirely. The ITA correctly concluded that such a method would give CBCC a double benefit. The Court finds that in view of the reduction of COP by the amount of short-term income, the decision to account for payment terms by reducing the COP by the amount of short-term income was reasonable and within the ITA's discretion.

The ITA also argues that payment terms are actual costs for delayed payment, and therefore must be included in COP under § 1677b(b). *Defendant's Memorandum In Opposition,* at 53. To the extent that the payment terms are an adjustment for inflation of the current cost to the future value on the payment date, this argument must be rejected. Such an adjustment is merely designed to preserve the purchasing power of the invoiced amount over the period allowed for payment. In the absence of a reduction in COP due to short term investment income, the

invoiced amount should be reduced by the amount of inflation between the invoice and payment dates to accurately reflect replacement cost at the date of invoice. To do otherwise would overstate the real cost by the amount of inflation experienced during the period allowed for payment.[3]

CBCC excluded interest on a loan from its parent company, Solvay, from the interest expenses that it reported to the ITA. The ITA included this cost as a cost of manufacturing. CBCC asserts that the loan proceeds were used for the construction of two furnaces to produce calcium carbide and were irrelevant to the production of silicon metal during the period of investigation. Moreover, CBCC alleges that the loan was made from funds paid as dividends by CBCC to Solvay. Solvay owns one hundred percent of CBCC, and CBCC argues that the loan should therefore be considered an equity infusion.

The ITA responds that its established practice is to treat money as fungible, and to allocate a proportional share of interest expenses to all goods produced by a respondent during the period of investigation.

> The Department considers financing expenses to be those costs incurred for the general operations of the corporation. The Department recognizes the fungible nature of a corporation's invested capital resources, including both debt and equity, and does not allocate corporate finance expenses to individual divisions of a corporation on the basis of fixed assets or sales per division * * *. Instead, [Commerce] allocates the interest expense related to the debt portion of the capitalization of the corporation, as appropriate, to the total operations of the consolidated corporation.

*Final Determination of Sales at Less Than Fair Value: Certain Small Business Telephone Systems and Subassemblies Thereof from Korea,* 54 Fed. Reg. 53,141, 53,149. While CBCC would presumably not pay interest on an "equity infusion," the record shows that CBCC does pay interest on the loan from Solvay. *CBCC Verification Report,* P.R. Document 209, at 358; *CBCC Verification Exhibit 11.* The Court will not require the ITA to characterize interest payments as dividends, or otherwise recast the transaction.

The ITA determined that "the new furnaces can, in fact, be used to produce silicon metal. These new furnaces could also free up the productive assets of CBCC to produce more silicon metal." *Final Determination: Silicon Metal from Brazil,* 56 Fed. Reg. at 26,987. CBCC does not deny these assertions, nor does it deny the ITA's assertion that CBCC has changed furnaces from the production of calcium carbide to silicon metal in the past. *Defendant's Memorandum In Opposition,* at 72; P.R. Document 209, at 359. The furnace finance expenses were thus not irrelevant to the production of silicon metal. The ITA's allocation of

---

[3] There may be a difference between the increase provided for by payment terms and the amount of inflation actually experienced during the period allowed for payment, either due to a difference between actual and anticipated inflation, or because the terms provide for interest. Such a difference between the payment terms and actual inflation may be included in COP.

interest expense from the loan from Solvay to the cost of production of silicon metal is reasonable and in accordance with law.

The department made a circumstance of sale adjustment to FMV to account for imputed credit expenses incurred on U.S. sales pursuant to 19 C.F.R. § 353.56(a)(2) (1991). The ITA imputed credit expenses to CBCC for sales made utilizing a letter of credit for the period between the date of shipment and the date payment was received by CBCC. CBCC argues that the ITA should not impute credit expenses for the time between the due date of the letter of credit and the date of remittance by the bank.

The cost associated with this delay is not a credit expense, CBCC argues, since no credit is being extended by CBCC under a letter of credit sale. It is a financial expense, already accounted for by the financial expenses related to the maintenance of working capital. To impute a credit expense is double counting, CBCC maintains.

The ITA responds that regardless of whether CBCC bore any credit risk, CBCC did not have access to the funds to offset its accounts receivable balances until payment was credited to its bank account. Therefore, the credit expense was properly imputed.

Commerce regulations permit an allowance for a *bona fide* difference in the circumstances of sales in the home market versus foreign market sales. 19 C.F.R. § 353.56(a); 19 U.S.C. § 1677b(a)(4)(B). The ITA found that CBCC's home market customers paid "at sight" and that there were no outstanding receivables with respect to those sales. *Final Determination: Silicon Metal From Brazil,* 56 Fed. Reg. at 26,981. This finding is supported by evidence in the record that shows that the terms of sale in Brazil always included customer pick-up at the plant. P.R. Document 210, at 369. The record also contains at least one example of a home market sale with payment within four or five days of Customer Confirmation. *CBCC Verification Report,* C.R. Document 75, at 2219.

The record reveals that some United States sales included payment terms of "payment as cash at 150 days from the date of the bill of lading." *CBCC Verification Report,* C.R. Document 75, at 2,218. For these sales, a circumstances of sale adjustment is supported by the record.

However, the record also contains evidence of sales that were made pursuant to a letter of credit payable "at sight." *CBCC Verification Exhibit M,* at 202. For example, the bill of lading for sale #14/90 is dated June 17, 1990. *CBCC Verification Exhibit F-4,* at 144. CBCCs bank credited CBCCs account on June 25, 1990. *CBCC Verification Exhibit M,* at 214. It is difficult to perceive why a delay of payment of four or five days for home market sales constitutes a *bona fide* difference from a delay of eight days for foreign market sales under 19 C.F.R. § 353.56(a), notwithstanding the extreme inflation experienced at the time. This issue is remanded to the ITA to explain why a difference of as little as three days constitutes a *bona fide* difference in the circumstances of these sales.

The ITA increased the General, Sales and Administrative ("GS&A") expenses reported by CBCC to include costs incurred by CBCC's parent

companies, Solvay do Brasil and Solvay & Cia. (collectively, "Solvay.") *Final Determination: Silicon Metal From Brazil,* 56 Fed. Reg. 26,979. The ITA required CBCC to submit an estimate of the value of services provided by Solvay to CBCC. The ITA used the unverified estimate as BIA. CBCC argues that this increase was unwarranted, because "it was demonstrated that Solvay does not contribute to the management or manufacture of silicon metal." *CBCC's Brief,* at 18.

At verification, the ITA noted that Solvay & Cia. made expansion decisions for CBCC, and Solvay do Brasil provided internal audit services to CBCC. *CBCC Verification Report,* P.R. Document 209, at 357. This evidence weighs against CBCC's assertion that the parent companies did not contribute to the management of CBCC. Although CBCC argues that the audits were merely the actions of a shareholder monitoring its investment, the Court finds that a reasonable mind could conclude that CBCC would have had to pay for the services provided by Solvay if Solvay had not provided them. These costs were properly allocated to CBCCs GS&A expenses.

The ITA calculated GS&A expenses for CBCC by prorating CBCCs annual GS&A expenses based on the cost of manufacturing ("COM") for each month during the period of investigation, because "GS&A expenses are period costs which should be based on the annual period in which they were incurred." *Final Determination: Silicon Metal From Brazil,* 56 Fed. Reg. at 26,987. CBCC argues that the Department should have accepted the monthly GS&A costs reflected in its books during the period of investigation.

Not all GS&A expenses that must be borne by a product are incurred in the month of production, as CBCC's method assumes. For example, CBCC did not include in its monthly GS&A an allocation of accrued vacation expenses reflected in its annual financial statements. *See CBCC Verification Report,* P.R. Document 209, at 356. The ITA's conclusion that GS&A expenses should be based on the annual period in which they were incurred is reasonable, and supported by evidence on the record.

CCM also takes issue with the ITA's method of allocating annual GS&A expenses to the monthly COP. The ITA allocated CCM's annual GS&A expenses by calculating the ratio of annual GS&A expenses to annual cost of sales ("COS") as these items were reported in CCM's financial statements. The ITA then multiplied this ratio by the monthly COM calculated on a replacement cost basis.

CCM argues that this method exaggerates its GS&A expenses because its reported annual COS is based on historical costs, while the monthly COM are based on current costs. The record reveals that CCM is correct.

CCM points out that if the allocation formula is accurate, the total allocated costs should equal the total recorded GS&A costs. As evidence that the formula exaggerates the monthly costs, CCM points out that the ITA allocated considerably more than half of CCM's annual GS&A costs to the six month period of investigation. While this is not conclu-

sive, further evidence in the record demonstrates that it is not the irrelevant happenstance that the ITA argues it is.

The record reveals that CCM's recorded historical monthly materials costs were systematically less than the replacement costs used by the ITA. *See CCM Verification Report,* C.R. Document 76, at 2242. If all else is equal, the inevitable result of this is that the sum of the monthly replacement costs (had they been calculated for the entire year) divided by the reported annual COS would be greater than one. Therefore, the total prorated GS&A costs for the year would exceed the reported annual GS&A costs that were to be "allocated."

However, it is not obvious from the record and briefs before the Court that the annual COS is equal to the sum of the historical monthly costs. The ratio of the sum of month GS&A costs divided by the sum of monthly costs of manufacturing, when the numerator and denominator have been adjusted for inflation to a common date, is not in general equal to the same ratio when the numerator and denominator have not been adjusted for inflation.

Because it is not clear from the record and briefs of the parties precisely how such adjustments were made, the Court remands the case to the ITA to reconsider the issue, and to explain in greater detail its reasoning. However, the ITA is directed to ensure that its allocation of GS&A expenses does not lead to a systematic overstatement of those expenses due to the restatement of monthly costs as replacement costs and to recalculate the allocation if necessary.

The ITA excluded the Brazilian value added tax ("ICMS" or "VAT") from home market sales prices and COP, on the ground that "The ICMS tax paid on inputs for home market is an indirect tax ultimately borne by the final consumer." *Final Determination: Silicon Metal From Brazil,* 56 Fed. Reg. at 26,984. CCM argues that the exclusion is unlawful.

The ITA now concedes that it should have included ICMS in both COP and home market sales prices, but argues that its failure to do so is harmless error. The ITA argues that the amount of ICMS collected on home market sales is exactly offset by the total of the amount of ICMS paid on inputs and the amount of ICMS remitted to the Brazilian government. Recalculation would not change the outcome, the ITA argues, and so remand is unnecessary.

CCM asserts that the amounts are not complementary, because by virtue of its export sales, CCM does not remit any ICMS that it collects to the Brazilian government.

Brazilian companies collect ICMS from their customers and pay ICMS on their purchases. The amount of ICMS paid on purchases is subtracted from the amount collected, and the difference is remitted to the Brazilian government. In this way, only the portion of the ICMS collected from the customer that is incurred due to the value added by the producer is remitted to the Brazilian government. A numerical hypothetical is instructive.

If the ICMS were 10%, and CCM paid $60 per ton for inputs to its production exclusive of ICMS, it would pay $6 per ton in ICMS on those inputs. If it sold that production domestically for $100 per ton exclusive of ICMS, it would then charge its customers $10 per ton in ICMS. Of this $10, $6 would be offset by the VAT paid on inputs and $4 would be remitted to the government.

When a company exports a portion of its production, no ICMS is collected on the export sales. Nevertheless, the exporting company pays ICMS on the inputs for the export production. The ICMS paid on such inputs may then be used to offset ICMS collected on domestic sales. To continue the example, if CCM sold 2 tons of its production domestically for $220, inclusive of ICMS, and exported 1 ton for $100 free of ICMS, CCM would have collected $20 of ICMS on the sales, and paid a total of $18 of ICMS on the inputs for the sales. CCM would therefore remit the difference of $2 to the Brazilian government.

No provision is made under the ICMS scheme for refunds. Thus, if the ICMS paid on production exceeds the amount collected for domestic sales, then the company receives a credit for the difference, but no refund. Hyperinflation rapidly destroys the value of such credits if not used. This is the situation for CCM. To return once more to the hypothetical, if CCM sold 2 tons domestically for $220 inclusive of ICMS, and exported 2 tons for $200, it would have paid $24 in ICMS on inputs, but would have collected only $20 in ICMS on its domestic sales. As a result, no ICMS would be remitted to the government, but the difference of $4 would be an additional cost.

The great preponderance of CCM's production is for export. CCM therefore never remits ICMS to the Brazilian government. Conversely, CCM does not recoup the full amount of the ICMS it pays on inputs. CCM maintains that since it does not remit any of the ICMS that it collects from its customers to the Brazilian government, its COP should be increased only by the amount of ICMS it paid on its inputs for domestic production, and not by the increment due to the value added by its production. The ITA asserts that both the COP and the home market price should include the full amount of ICMS charged the customer.

In the hypothetical example, CCM argues that its home market price should include the $10 it charges customers for ICMS, but that its COP should include only the $6 that it pays in ICMS on inputs. The ITA agrees that the home market price should include the $10 ICMS, but argues that the COP should also include $10 in ICMS.

CCM offers the following legal analysis. Section 19 U.S.C. § 1677b(b) authorizes the ITA to disregard home market prices in its determination of FMV when sales at less than the cost of production have been made over an extended period of time and in substantial quantities and are not at prices which permit recovery of all costs within a reasonable period of time. Section 1677b(b) does not define "all costs," but CCM argues that the ITA has interpreted the term to mean the same categories of materials, fabrication and general costs set forth in 19 U.S.C.

§ 1677b(e)(1) defining constructed value. Section 1677b(e)(1) provides that constructed value shall include "the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) * * *."

CCM argues that the ITA correctly determined that the ICMS paid on inputs for exported merchandise is not "remitted or refunded" and should therefore be included in constructed value. CCM concludes that, "Since ITA uses essentially the same cost principles to compute COP and constructed value, the same VAT that ITA included in calculating constructed value likewise must be included in COP." *CCM's Brief* at 31. Furthermore, internal taxes relate to the home market and should be included in COP even if the tax is remitted or refunded, CCM maintains.

CCM asserts that the ITA has consistently construed the home market price to include all revenue a foreign seller receives on the sale of merchandise, even if not paid by the seller's customer. *See, e.g., Certain Electrical Conductor Aluminum Redraw Rod from Venezuela,* 53 Fed. Reg. 24,755, 24,760 (1988); *Certain Fuel Ethanol from Brazil,* 51 Fed. Reg. 5,572, 5,573 (1986). Since CCM does not pay any of the VAT that it receives from its Brazilian customers to the Brazilian government, CCM contends that the VAT is revenue that should be included in its home market price.

Moreover, when VAT is imposed on a foreign producer's domestic sales but not its United States sales, CCM argues that the ITA is not authorized to adjust by subtracting the amount of the VAT from FMV. Rather, it must add the amount of the VAT to USP pursuant to 19 U.S.C. § 1677a(d)(1)(C) (1988), which provides that USP shall be increased by

> the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation * * *.

*See Zenith Electronics Corp. v. United States,* 11 Fed. Cir. (T) ___, ___, 988 F.2d 1573 (1993); *Zenith Electronics Corp. v. United States,* 10 CIT 268, 633 F. Supp. 1382, 1394 (1986). The statute and the case law dictate that the dumping margin must be calculated by comparing FMV that includes VAT to a USP that includes VAT. CCM argues that reading § 1677b(b) *in pari materia* with § 1677b(a) yields the conclusion that "price" as used in § 1677b(b) respecting COP must mean the same as "price" used in § 1677b(a) respecting FMV, and must therefore include VAT.

The ITA responds to CCM's arguments by pointing out that there are significant differences between COP and constructed value. For example, constructed value includes a minimum profit of eight percent.

§ 1677b(e)(1)(B). The ITA regulation on COP states that COP will be calculated "based on the cost of materials, fabrication, and general expenses, *but excluding profit,* incurred in producing such or similar merchandise." 19 C.F.R. § 353.51(c) (1991) (emphasis added). Similarly, the ITA argues, the inclusion of VAT in constructed value does not dictate its inclusion in COP.

The ITA concedes that it should have included VAT in COP and the home market price, but not for the reasons urged by CCM. The ITA argues that the amount that should be included is the same for both COP and home market price, but unfortunately entirely fails to address the point that none of the VAT incurred due to CCM's value added is ever actually paid. Instead, ITA argues that, "The only difference between the $4 [of hypothetical ICMS collected from the customer for CCM's value added] and the $6 [of hypothetical ICMS paid on inputs and collected from the customer] is that CCM paid the $4 directly to the government, while CCM paid the $6 to its supplier, as collection agent for the government." *Defendant's Memorandum in Opposition,* at 79. The implication that CCM pays all of the ICMS it collects from its customers is not supported by the record.

The Court is not persuaded by CCM's *in pari materia* construction of 1677b. Although the same word is used in both § 1677b(a) and (b), the two subsections refer to sales in different markets. Given the differences pointed out by the ITA between COP and constructed value, it is clear that the two numbers do not include all of the same costs. Moreover, the fact that CCM does not pay ICMS on its domestic sales is due to the fact that export sales are exempt from ICMS. Since exports are taxed differently from domestic sales, the ITA may properly account for COP and home market price differently from constructed value and USP. *See, Cost Analysis Under The Antidumping Law,* 21 Geo. Wash. J. Int'l L. & Econ. 357, 400 n.265 (1988).

The antidumping statutes do not prescribe a particular method for determining the COP. Therefore, elucidation of the method is delegated to the ITA. *Chevron,* 467 U.S. at 844. However, the ITA now concedes that exclusion of ICMS from COP and home market price was error, and although it urges a particular result, it fails to enunciate any rationale for its proposed method that is founded upon evidence in the record. While a reasonable interpretation of the antidumping statutes may permit or require that CCM's ICMS be accounted for as the ITA has argued, the ITA has failed to articulate such an interpretation.

"The grounds upon which an administrative order must be judged are those upon which the record discloses that its action is based." *Securities Exchange Commission v. Chenery Corp.,* 318 U.S. 80, 87, 87 L.Ed. 626, 633, 63 S. Ct. 454, 459 (1943). An administrative decision must stand or fall upon its *ratio decidendi.* Since none has been articulated here, the Court remands this issue for the ITA to specifically address how and why the COP and home market price should account for the

fact that CCM does not pay the ICMS it collects from its Brazilian customers to the Brazilian government.

CBCC seeks an adjustment to constructed value itself, rather than to COP. Constructed value is given much fuller form by the statutes, and as a result, fewer details of its determination are delegated to the discretion of the ITA. Specifically, as noted above, 19 U.S.C. § 1677b(e) states that constructed value shall include the cost of materials, "exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used." CBCC argues that the ICMS is such a tax. The ITA included ICMS paid on inputs in constructed value for CBCC on the ground that the ICMS is not "remitted or refunded upon exportation." *Final Determination: Silicon Metal From Brazil*, 56 Fed. Reg. at 26,986.

Like CCM, CBCC does not collect ICMS on export sales. Unlike CCM, CBCC manages to recoup much or all of the ICMS that it pays on inputs for export production, because CBCC sells a substantial portion of its production in Brazil. Therefore, CBCC reasons, it pays no ICMS on its inputs for export production, and its constructed value should not include ICMS. CBCC argues that there is no functional difference between a rebate upon export and a tax credit that is recovered before export. CBCC's argument reveals a difficulty in the interaction between USP and constructed value.

"Remit" is defined as "1. a: to release one from the penalty of: PARDON, FORGIVE * * * b: To refrain from exacting (as a payment) * * *" Webster's New International Dictionary, at 2,107 (1986). By virtue of CBCCs export sales, the Brazilian government refrains from exacting ICMS otherwise due on value added to merchandise CBCC sells in the domestic market, but in the amount paid on the inputs to domestic production. The remission is on taxes due upon domestic sales, but what is remitted is the tax paid on inputs for exported merchandise. The economic reality is that the cost of exported merchandise does not include ICMS on materials.

The remission of ICMS thus appears to fall within the purview of § 1677b(e)(1)(A). Unfortunately, as CCM's argument regarding tax adjustments to USP points out, it also appears to fall within the literal language of § 1677a(d)(1)(C). The materials in question (charcoal, quartz, electrodes and wood chips) are unquestionably components of the exported merchandise. And the ICMS tax on these components is rebated or not collected by reason of the exportation of the merchandise to the United States.

To the extent that the ICMS is added to or included in the price of the same kind of merchandise in Brazil, USP should therefore apparently be increased by the amount of the tax. § 1677a(d)(1)(C). The ITA's conclusion that ICMS "is an indirect tax ultimately borne by the final consumer," is tantamount to a finding that the ICMS is added to or included in the price of the Brazilian sales, and is supported in the record by evi-

dence that ICMS was billed separately. *Final Determination: Silicon Metal From Brazil,* 56 Fed. Reg. at 26,984.

To include the amount of tax not collected by reason of export in the USP and exclude the same amount from constructed value results in a reduction of dumping duties of twice the amount of the tax. This is double counting. In an analogous situation, this Court recognized that adding excise duty drawback to USP under § 1677a(d)(1)(B) while subtracting the same from FMV under § 1677b(e)(1)(A) resulted in double counting. *Seramphore Industries v. U.S. Department of Commerce,* 12 CIT 825, 831, 696 F. Supp. 665, 670 (1988).

The interpretation of § 1677b(e)(1)(A) urged by CBCC appears to square reasonably with the statutory language. Yet when combined with the interpretation of § 1677a(d)(1)(C) urged by CCM and supported by *Zenith,* the result is untenable. Despite the apparent overlap between what is signified by "remitted or refunded" in § 1677b and what is signified by "rebated, or * * * not collected" in § 1677a, the fact that different words are used may allow a construction that would avoid double counting.

Because this potential collision between § 1677a and § 1677b has not been addressed directly in these proceedings, and since remand is necessary on the related issue of the treatment ICMS collected by CCM, the Court remands this issue to the ITA. On remand the ITA is instructed to articulate a method and rationale for the treatment of ICMS exemptions due to export under the two statutory provisions that both recognizes the economic reality of non-payment due to export and avoids double counting.

Plaintiff Rima challenges the ITA's rejection of its voluntary response. The ITA received unsolicited responses to its questionnaires from Rima and two other companies. After examining the responses, the ITA sent a letter to counsel for the three voluntary respondents listing deficiencies in their responses. P.R. Document 74. After receiving the deficiency responses, the ITA found that deficiencies remained in most areas, and requested clarification and more information. P.R. Document 122.

The ITA again received responses from the three companies. The responses indicated that some information was still not available because the employees of the companies were on "collective vacation." P.R. Document 134–136. The ITA again concluded that the responses were deficient. The deficiencies in the Rima response included dates of sales, similar merchandise adjustments, critical circumstances information, and commission offsets. P.R. Document 153.

Rima now argues that the ITA's decision to reject Rima's response was unreasonable. In support of its contention, Rima asserts that many of the errors cited by the ITA were actually errors made by the ITA. However, Rima fails to indicate which errors it is referring to, or to cite to any evidence in the record in support of its position.

In the only specific example Rima does provide (albeit again without any citation to the record), Rima states that the ITA initially concluded that Rima had misstated the ICMS tax, but eventually used the same calculation as Rima submitted. Unfortunately, this sample is not among the deficiencies leading to the rejection of Rima's response. *See* P.R. Document 153. The Court finds that the ITA's decision to reject Rima's voluntary response is supported by substantial evidence in the record.

For the foregoing reasons, this case is remanded to the ITA. On remand, the ITA is instructed to reexamine the circumstances of sale adjustment for letter of credit sales and explain why such sales constitute a *bona fide* difference in the circumstances of domestic sales. The ITA is further directed to explain in greater detail its allocation of annual GS&A expenses to the merchandise produced during the period of investigation, and change said allocation if it systematically overstates GS&A expenses. The ITA shall announce a method and rationale for complying with 19 U.S.C. §§ 1677a(d)(1)(C) and 1677b(e)(1)(A) that avoids doubt counting. The method and rationale for complying with 19 U.S.C. §§ 1677a(d)(1)(C) and 1677b(e)(1)(A) shall account for the economic reality that ICMS that is paid on inputs to export production, and recovered from taxes otherwise due the Brazilian government, is not a cost of producing silicon metal for export in Brazil.