**Slip-Op. 03-42**

# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: CARMAN, CHIEF JUDGE

| | |
|---|---|
| MAUI PINEAPPLE COMPANY, LTD.,    : <br><br> Plaintiff,    : <br><br> v.    : <br><br> UNITED STATES,    : <br><br> Defendant,    : <br><br> and    : <br><br> DOLE FOOD COMPANY, INC., DOLE : <br> PACKAGED FOODS COMPANY, and : <br> DOLE THAILAND, LTD.,    : <br><br> Defendant-Intervenors.    : | Court No. 01-01017 <br> PUBLIC VERSION |

[Plaintiff's Rule 56.2 motion for judgment upon the agency record is granted in part, denied in part. Plaintiff's motion for oral argument is denied.]

*Collier Shannon Scott, PLLC (Paul C. Rosenthal, David C. Smith, Jr., Jennifer E. McCadney)*, Washington, D.C., for Plaintiff.

*Robert D. McCallum, Jr.*, Assistant Attorney General; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Lucius B. Lau*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Brent M. McBurney*, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Glenn R. Butterton*, Senior Attorney, Office of Chief Counsel for Import Administration, United States Department of Commerce, Of Counsel, for Defendant.

*Hale and Dorr LLP (Michael D. Esch, Aimen Mir)*, Washington, D.C., for Defendant-Intervenors.

Dated: April 16, 2003

OPINION

**CARMAN, CHIEF JUDGE:** Plaintiff Maui Pineapple Company, Ltd. ("Maui") moves for judgment upon the agency record and challenges the United States Department of Commerce's ("Commerce") results in *Notice of Final Results of Antidumping Duty Administrative Review and Recission* [sic] *of Administrative Review in Part: Canned Pineapple Fruit From Thailand*, 66 Fed. Reg. 52,744 (Oct. 17, 2001) ("*Final Results*") and the accompanying *Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review: Canned Pineapple Fruit from Thailand* (Oct. 9, 2001), Pub. Doc. 216, Def.'s Pub. App. Ex. 2 ("*Decision Memo*"). This Court has jurisdiction to hear the case pursuant to 28 U.S.C. § 1581(c) (2000). The Court holds that Commerce properly accepted information on sales to the United States military by Defendant-Intervenors at verification and properly accepted corrections to Defendant-Intervenors' clerical errors. The Court remands the issues of imputed credit expenses and the alleged clerical error in Commerce's final margin program for further consideration by Commerce. For the reasons that follow, Plaintiff's motion is granted in part, and denied in part.

BACKGROUND

Commerce issued an antidumping duty order covering canned pineapple fruit from Thailand in 1995. *Final Determination of Sales at Less Than Fair Value: Canned Pineapple Fruit From Thailand*, 60 Fed. Reg. 29,553 (June 5, 1995) ("*1995 Final Determination*"), *as amended Notice of Antidumping Duty Order and Amended Final Determination: Canned Pineapple Fruit From Thailand*, 60 Fed. Reg. 36,775 (July 18, 1995) ("*1995 Amended Final Determination*"). Imports by Dole Food Company, Inc., Dole Packaged Foods Company, Inc.,

and Dole Thailand, Ltd. (collectively "Dole") were covered by the initial order, and Dole was found to have a 1.73% dumping margin. *1995 Amended Final Determination*, 60 Fed. Reg. at 36,776.

On July 20, 2000, Commerce published notice of opportunity to request a review of the initial antidumping order for the period of review of July 1, 1999 to June 30, 2000. *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review*, 65 Fed. Reg. 45,035, 45,036 (July 20, 2000). The fifth administrative review, in which Dole participated, was initiated on September 6, 2000. *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part*, 65 Fed. Reg. 53,980, 53,982 (Sept. 6, 2000).

Commerce sent Dole its initial questionnaire on September 1, 2000. (Letter from U.S. Department of Commerce to Hale & Dorr LLP (on behalf of Dole) (Sept. 1, 2001), Pub. Doc. 19, Pl.'s Pub. App. Ex. 15, Def.'s Pub. App. Ex. 7, Dole's Pub. App. Ex. 4.) In the questionnaire, Dole was asked to describe the sales process for each of its sales methods or channels of distribution. (Dole's Section A Questionnaire Response (Oct. 10, 2000), at A-25 to A-27, Pub. Doc. 63, Def.'s Pub. App. Ex. 8 at 9-11.) With regard to sales to the United States military, Dole indicated that "sales are made to distributors that handle distribution to military commissaries (i.e., military base retail grocery outlets). Dole sells in large lots to the distributors. Subsequently, . . . Dole repurchases and then resells the merchandise in small lots pursuant to a price list applicable to military sales. As determined by [Commerce] in its original investigation [in 1995], Dole's sale to the distributor is the first sale to an unaffiliated purchaser. Accordingly, the sales to the distributor are reported in the U.S. sales listing while Dole's subsequent resales to

the military commissaries have been excluded from the U.S. sales listing." (*Id.* at A-26 to A-27, Def.'s Pub. App. Ex. 8 at 10-11.)[1]

Dole submitted its United States sales listings on November 6, 2000. (Dole's Section B, C, and D Questionnaire Response (Nov. 6, 2000), Prop. Doc. 21, Dole's Conf. App. Ex. 8; Dole's Section B, C, and D Questionnaire Response (Nov. 7, 2000), Pub. Doc. 92, Dole's Pub. App. Ex. 8.) The quantity of sales was reported according to the actual number of cases sold. (Dole's Section C Questionnaire Response, at C-15, Dole's Pub. App. Ex. 8 at 21.) A full case of 8 oz., 15 oz., or 20 oz. cans contains 24 cans. (*Id.*; Dole's Section A Questionnaire Response, at A-44, Def.'s Pub. App. Ex. 8 at 19.) Dole sold product code 38900-72475 in 4-packs of 15.25 oz. cans. (Dole's Section A Questionnaire Response, at Ex. A-12(d), Dole's Pub. App. Ex. 7 at 18, 21.) The gross unit price per actual case of product code 38900-72475 was [[      ]]. (Dole's Section A Questionnaire Response (Oct. 6, 2000), at Ex. A-12(d), Prop. Doc. 8, Dole's Prop. App. Ex. 7 at 18, 21.)

Dole was also asked to calculate imputed credit expenses. (Dole's Section B Questionnaire Response, at B-30, Dole's Pub. App. Ex. 8 at 6.)[2] Commerce instructed Dole to

---

[1] In the 1995 order, Commerce "excluded all sales made to military commissaries from our calculation of [United States price] because we determined that these sales do not represent the sale to the first unrelated purchaser. In this channel of trade, the first unrelated purchaser of [canned pineapple fruit] is a distributor for the U.S. military. This distributor takes title and physical possession of the merchandise before reselling it to the military commissaries. Dole's sales to the distributor were included in our calculation of [United States price]." *1995 Final Determination*, 60 Fed. Reg. at 29,554.

[2] When calculating normal value to determine if merchandise is being sold in the United States at less than fair value, Commerce may consider differences in the circumstances of sale and make adjustments to its calculations when the seller incurs costs in its home market that it does not incur when selling to the United States market. *See Torrington Co. v. United States*, 156 F.3d 1361, 1362-63 (Fed. Cir. 1998). Such adjustments include imputed credit expenses.

"[r]eport the unit cost of credit computed at the actual cost of short-term debt borrowed by [Dole] in the foreign market. If [Dole] did not borrow short-term during the period of review, [it should] use a published commercial short-term lending rate." (*Id.*) Commerce defined "foreign market" as "the home market or a third-country market, whichever will be used to determine normal value." (*Id.* at B-1, Dole's Pub. App. Ex. 8 at 3.) Dole reported that its largest third-country market is Canada but that it did not have short-term borrowing in Canada. (*Id.* at B-2, B-31, Dole's Pub. App. Ex. 8 at 4, 7.) Dole used the average bank prime lending rate in Canada for the four quarters of the period of review as published in *The Economist* to calculate the imputed credit expenses. (*Id.* at B-31 and Ex. B-8, Dole's Pub. App. Ex. 8 at 7-13.)

On December 11, 2000, Commerce sent a supplemental questionnaire to Dole in which Commerce noted "that for different products actual cases are not the same size" and asked Dole to "report [its] sales quantity and all adjustments on a consistent basis (e.g., kilograms)." (Commerce's Supplemental Questionnaire (Dec. 11, 2000), at 8, Pub. Doc. 115, Pl.'s Pub. App. Ex. 9 at 10.) In its response, Dole "revised the sales database to convert the quantity and all adjustments to a common basis, a standard case equivalent (i.e., equivalent to 24 cans of 20 oz. product, approximately 30 lbs. net product weight)." (Dole's Supplemental Questionnaire Response (Jan. 16, 2001), at 38, Pub. Doc. 134, Dole's Pub. App. Ex. 11 at 5, Def.'s Pub. App. Ex. 10 at 6.)

Commerce sent Dole a letter on January 25, 2001, in which Commerce stated that it had

*Id.* An adjustment "for differences in credit expenses is made to account for the producer's opportunity cost of extending credit to its customers. By allowing the purchaser to make payment after the shipment date, the producer forgoes the opportunity to earn interest on an immediate payment." *NTN Bearing Corp. of Am. v. United States*, 104 F. Supp. 2d 110, 122 (Ct. Int'l Trade 2000) (internal citations and quotations omitted).

"found that both [Dole's] U.S. and third-country databases have reported zero as the quantity of standard cases . . . for a significant number of observations" and asked Dole to submit corrected databases. (Letter from U.S. Department of Commerce to Hale & Dorr LLP (on behalf of Dole) (Jan. 25, 2001), at 1, Pub. Doc. 144, Pl.'s Pub. App. Ex. 12 at 1.) Dole filed a response addressing Commerce's concerns, but no military or other sales data was submitted. (Letter from Hale and Dorr LLP (on behalf of Dole) to U.S. Department of Commerce (Feb. 14, 2001), Pub. Doc. 152, Pl.'s Pub. App. Ex. 13 at 2-3.) When Dole submitted its sales reconciliation data, it again indicated that military sales were omitted from the reconciliation data. (Dole's Sales Reconciliation Data (Jan. 26, 2001), at Ex. R-18, Pub. Doc. 145, Dole's Pub. App. Ex. 12 at 8-9.)

Verification outlines were issued to Dole on January 23, 2001 and January 31, 2001. (Letter from U.S. Department of Commerce to Hale & Dorr LLP (on behalf of Dole) (Jan. 23, 2001), Pub. Doc. 141, Def.'s Pub. App. Ex. 11 ("Jan. 23 Verification Agenda"); Letter from U.S. Department of Commerce to Hale & Dorr LLP (on behalf of Dole) (Jan. 31, 2001), Pub. Doc. 146, Def.'s Pub. App. Ex. 13 ("Jan. 31 Verification Agenda").) The letters indicated that "verification is not intended to be an opportunity for submitting new factual information. We will accept new information at verification only when (1) the need for that information was not evident previously, (2) the information makes minor corrections to information already on the record, or (3) the information corroborates, supports, or clarifies information already on the record." (Jan. 23 Verification Agenda, at 2, Def.'s Pub. App. Ex. 11 at 2; Jan. 31 Verification Agenda, at 2, Def.'s Pub. App. Ex. 13 at 2.)

At the beginning of verification, Dole presented Commerce with "minor corrections" to its sales database and submitted data regarding United States military sales. (Dole's Verification

Corrections (Feb. 28, 2001), Pub. Doc. 154, Pl.'s Pub. App. Ex. 16; Dole's Verification

Corrections (Feb. 27, 2001), Prop. Doc. 60, Pl.'s Prop. App. Ex. 16.) Dole explained that the

military sales had been excluded from Dole's earlier submissions based on Commerce's

determination in the 1995 order, but its distribution system changed prior to the period of review

in the present case. (Dole's Verification Corrections, at Attach. 2, Pl.'s Pub. App. 16 at 8.)

Whereas prior to the period of review "Dole repurchased products from distributors for resale

into the military channel . . . , Dole now sells to a single military channel distributor who handles

all sales to military customers. Accordingly, [Dole asserted that] it was error to exclude the

military channel sales, and those sales should be added to the sales database. The military

channel sales accounted for just [[ ]] of all sales of subject merchandise during the [period of

review]." (*Id.*; Dole's Verification Corrections, at Attach. 2, Pl.'s Prop. App. 16 at 9.) The

military sales comprised [[ ]] standard case equivalents. ("Verification of the Sales and

Cost Information in the Response of Dole Food Company, Inc., Dole Packaged Foods Company,

and Dole Thailand Ltd. in the 1999-2000 Administrative Review of Canned Pineapple Fruit from

Thailand" (Apr. 2, 2001), at Ex. U-18, Prop. Doc. 71, Def.'s Prop. App. Ex. A1 ("Verification

Report"); Pl.'s Prop. Br. at 7; Def.'s Prop. Br. at 7.)[3] Commerce proceeded to verify the military

---

[3] Dole indicated in its questionnaire responses that the pineapple it sells is sourced from both Thailand and the Philippines at the same price and that it does not keep track of the country of origin of the specific products shipped from its United States inventory. (Dole's Section A Questionnaire Response, at A-2, Def.'s Pub. App. Ex. 8 at 5.) Dole therefore reported sales based on weighting factors derived by multiplying the total quantity and value of its United States sales during the period of review by the ratio of shipments from Thailand to the United States to total shipments from Thailand and the Philippines during the period of review. (*Id.*) At the start of verification, Dole reported [[ ]] standard cases of both Thai and Philippine origin product as its United States military sales data. (Verification Report, at Ex. U-18, Def.'s Prop. App. Ex. A1; Pl.'s Prop. Br. at 7; Def.'s Prop. Br. at 7.) According to Defendant and Dole, [[ ]] standard cases were of Thai origin product. (Def.'s Prop. Br. at 7; Dole's Prop. Br. at

sales and found no discrepancies. (Verification Report at 28-29, 31, 41, Pub. Doc. 172, Dole's

Pub. App. Ex. 16 at 5-6, 8, 18.) Commerce included the military sales in its calculation of Dole's

dumping margin. *Notice of Preliminary Results and Partial Rescission of Antidumping Duty

Administrative Review: Canned Pineapple Fruit From Thailand*, 66 Fed. Reg. 18,596, 18,599

(Apr. 10, 2001).

In its case brief to Commerce, Maui asserted that Commerce should apply adverse facts

available in determining Dole's dumping margin because Dole's submission of the United States

military sales data was untimely. ("Petitioners' Case Brief For Dole Food Company, Inc., Dole

Package Foods Company, and Dole Thailand, Ltd." (July 9, 2001), at 1-7, Pub. Doc. 197, Def.'s

Pub. App. Ex. 14 at 3-9.) Maui suggested that Commerce find a dumping margin of at least

[[      ]]% as the highest non-aberrational transaction margin. (*Id.* at 7, Def.'s Pub. App. Ex.

14 at 9; "Petitioners' Case Brief For Dole Food Company, Inc., Dole Package Foods Company,

and Dole Thailand, Ltd." (July 9, 2001), at 7, Prop. Doc. 88, Def.'s Prop. App. Ex. E at 9.) In its

administrative rebuttal brief, Dole responded that the margin suggested by Maui was the result of

a clerical error in the conversion factor for product code 38900-72475. ("Rebuttal Brief on

Behalf of Dole Food Company, et al." (July 17, 2001), at 14, Pub. Doc. 206, Dole's Pub. App.

Ex. 19 at 19 ("Dole's Rebuttal Br.").) Dole explained that when it was asked to resubmit the

sales data in standard case format, the number of cans per case for product code 38900-72475

was mistakenly listed as eight rather than four. (*Id.* at 16, Dole's Pub. App. Ex. 19 at 21;

---

8 n.8.) Commerce accepted and verified the weighting factors. *Decision Memo*, at 4, Def.'s Pub.
App. Ex. 2 at 4. Dole asserts that the United States military sales of Thai origin product makes
up at most [[    ]]% of total sales of Thai origin product in the United States. (Dole's Prop. Br. at
8 n.8.)

"Rebuttal Brief on Behalf of Dole Food Company, et al." (July 16, 2001), at Annex 3, Prop. Doc.

93, Dole's Prop. App. Ex. 19 at 35-37.) Additionally, the conversion factor to convert the actual

case configuration of a 24-can, full-case equivalent was incorrectly indicated as 0.33.[4] (*Id.*)

These mistakes had caused the gross unit price for the product to be incorrectly stated, and Dole

asked Commerce to accept corrections of these clerical errors. (Dole's Rebuttal Br., at 16-17,

Dole's Pub. App Ex. 19 at 21-22.) After providing Maui with an opportunity to comment on the

issue, Commerce relied upon *Certain Fresh Cut Flowers from Colombia; Final Results of*

*Antidumping Duty Administrative Reviews*, 61 Fed. Reg. 42,833, 42,834 (Aug. 19, 1996)

("*Colombian Flowers*") to accept the corrections. *Decision Memo*, at 12-13, Def.'s Pub. App.

Ex. 2 at 12-13.

Maui also asserted in its case brief that the imputed credit expense on Canadian sales was

overstated by Dole. (Pl.'s Case Br., at 14, Def.'s Pub. App. Ex. 14 at 11.) Maui argued that

Commerce should apply a hypothetical Canadian interest rate imputed from Dole's U.S.

borrowing rate. (*Id.*) Commerce noted that "[w]here a respondent has no short-term borrowings

in the currency of the transaction, it is [Commerce's] policy to use publicly available information

to establish a short-term interest rate applicable to the currency of the transaction." *Decision*

*Memo*, at 7 cmt. 3 and n.12, Def.'s Pub. App. Ex. 2 at 7. Commerce therefore accepted the

information that Dole submitted and rejected Maui's argument. *Id.*

Commerce calculated a 0.49% dumping margin for Dole. *Final Results*, 66 Fed. Reg. at

52,744. Maui filed its complaint with this Court on December 14, 2001.

---

[4] Dole stated that the proper conversion factor was 0.17. (Dole's Rebuttal Br., at 17, Dole's Pub. App. Ex. 19 at 22.)

PARTIES' CONTENTIONS

I.     *Plaintiff's Contentions*

Plaintiff contends that Commerce wrongfully accepted the military sales data submitted by Dole. (Pl.'s Pub. Br. at 11.) First, Maui states that Commerce was statutorily prevented from accepting the information because it was submitted after the deadline established for submission. (*Id.* at 11-12 (citing 19 U.S.C. § 1677e(a) (1994)).) Maui argues that the information was submitted more than three months after the deadline had elapsed and therefore Commerce should have relied upon facts otherwise available rather than relying on the submitted information. (*Id.* at 12.) Maui notes that while under 19 U.S.C. § 1677m(d) Commerce must allow a respondent to remedy a deficiency in its submission, Commerce may reject a supplemental submission where the information is not submitted within the time limits established for completion of the review. (*Id.* at 12-13 (citing 19 U.S.C. § 1677m(d)(2)).) There are also certain circumstances under which Commerce may not refuse to consider submitted information that does not meet all applicable requirements for submission, but Maui points out that such information must be submitted within applicable deadlines. (*Id.* at 13 (citing 19 U.S.C. § 1677m(e)(1)).) Maui argues that Commerce's reliance on its "sometimes-relied-upon 'policy' of accepting new factual information after the established deadline . . . effectively reads [19 U.S.C. § 1677m(e)(1)] out of the statute." (*Id.*) Maui challenges Defendant's insistence that the information was adequately verified, contending that in other cases where Commerce has accepted late-reported sales, Commerce appears to have verified every omitted sale. (Pl.'s Pub. Reply Br. at 11-12.) Maui points out that in the present case, only four of the omitted United States military sales were verified. (*Id.*)

Second, Maui relies on the Court's decision in *Florex v. United States*, 705 F. Supp. 582 (Ct. Int'l Trade 1988), for the principle that failure to report even one United States sale is a "serious error." (Pl.'s Pub. Br. at 13.) Maui also cites *Tatung Co. v. United States*, 18 Ct. Int'l Trade 1137 (1994), where unreported sales were discovered at verification but Commerce refused to accept them and instead used adverse facts available. (*Id.* at 13-14 (citing *Tatung*, 18 Ct. Int'l Trade at 1140-41).) Maui contends that Commerce's own administrative determinations are directly inconsistent with Commerce's determination in this case. (*Id.* at 14-21.) Plaintiff states that it "is unaware of any case in which the Court has permitted Commerce to accept such a significant number of sales several months after the deadline established for their submission." (*Id.* at 21.) Maui disputes Commerce's categorization of the sales data as a "minor correction" and contends that Commerce never stated how the submitted military sales correct information "already on the record." (Pl.'s Pub. Reply Br. at 5, 15.)

Third, Plaintiff argues that Commerce's "'policy' of accepting 'minor corrections' conflicts with the statute, and so must be voided." (Pl.'s Pub. Br. at 22.) Maui also contends that the "policy" is inconsistent with Commerce's other articulations as to its treatment of information submitted after an initial submission. (*Id.*) Maui's view is that Commerce's acceptance of the military sales data is contrary to Commerce's cautionary statements to Dole that information must be submitted by the established deadlines. (*Id.*) Maui quotes Commerce's admonition in the verification agendas that "verification is not intended to be an opportunity for submitting new factual information." (*Id.* at 23 (quoting Jan. 23 Verification Agenda, at 2, Pl.'s Pub. App. Ex. 18 and Jan. 31 Verification Agenda, at 2, Pl.'s Pub. App. Ex. 19) (emphasis omitted).) Maui contends that this language and similar admonitions by Commerce during this

review contradict Defendant's argument that Commerce's verification agenda constituted a new request for information. (Pl.'s Pub. Reply Br. at 4.) Maui argues that if Commerce had followed its admonitions in the verification agendas, it would have found that the omitted information should have been submitted previously because Dole was required to report all United States sales. (Pl.'s Pub. Br. at 23.) Maui contends that Commerce would have also found that the military sales were not minor corrections but rather were new sales that did not corroborate, support, or clarify information already on the record. (*Id.*)

In response to Defendant's argument that Commerce has discretion in establishing deadlines and evaluating the adequacy of information, Plaintiff maintains that the letters sent to Dole by Commerce made clear that no new information would be accepted. (Pl.'s Pub. Reply Br. at 13-14.) Maui relies upon *Reiner Brach GmbH & Co. v. United States*, 206 F. Supp. 2d 1323 (Ct. Int'l Trade 2002). Maui explains that in *Reiner Brach*, Commerce's decision not to accept the respondent's data reported at verification was upheld because the failure to report the data based on the respondent's misunderstanding of its reporting obligations did not excuse the omission. (*Id.* at 14 (citing *Reiner Brach*, 206 F. Supp. 2d at 1330-31).) Maui argues that in the present case, Commerce had no reason to believe that Dole's exclusion of the military sales data was improper or that Dole's distribution process had changed. Maui asserts that, just as in *Reiner Brach*, Commerce had no reason to believe that a deficiency existed in light of the respondent's vague responses to Commerce's deficiency letters. (*Id.* at 14-15.)

In addition, Maui challenges Commerce's acceptance of the corrections submitted by Dole as to product code 38900-72475. (Pl.'s Pub. Br. at 26.) Maui maintains that, in order to be timely, the corrections should have been submitted no later than in Dole's case brief. (*Id.* at 26-

27.) Maui contends that because Dole submitted the corrections in its rebuttal brief, the corrections were untimely. (*Id.*) According to Maui, before Commerce accepts a respondent's corrections of clerical errors, the conditions set forth in *Colombian Flowers* must be satisfied. (*Id.* at 27-28.) Maui contends that Dole failed to meet two of the conditions required by *Colombian Flowers*: (1) the respondent must have availed itself of the earliest reasonable opportunity to correct the error, and (2) the clerical error allegation and corrections must be submitted no later than the due date for the respondent's administrative case brief. (*Id.* at 28-29.) In its *Decision Memo*, Commerce reasoned that "[b]ecause Dole did not realize that it had made an error until [Maui's] allegation called its attention to certain high-margin sales, its rebuttal brief was the earliest opportunity to correct the error." *Decision Memo*, at 13, Def.'s Pub. App. Ex. 2 at 13. Maui believes that Commerce incorrectly read the first condition noted above as permitting Dole to make corrections at its earliest opportunity, regardless of the second requirement. (Pl.'s Pub. Br. at 29.) Plaintiff cites another agency decision in which Commerce refused to accept corrections to a clerical error when they were first introduced in the respondent's rebuttal brief. (*Id.* at 30 (citing *Certain Cold-rolled Carbon Steel Flat Products from the Netherlands: Final Results of Antidumping Duty Administrative Review*, 64 Fed. Reg. 11,825, 11,829 (Mar. 10, 1999)).) Maui states that regardless of whether it had an opportunity to comment on the issue, Commerce should not have considered the corrections in the first place because they were untimely. (Pl.'s Pub. Reply Br. at 19.) Maui further argues that acceptance of the corrections of the clerical errors, as well as the military sales data, was fundamentally unfair. (Pl.'s Pub. Br. at 30.) According to Maui, Commerce changed its policy as to the acceptance of corrections and deviated from its application of *Colombian Flowers* without a reasonable

explanation.  (Pl.'s Pub. Reply Br. at 19-21.)  Maui remarks that "[t]o sanction Commerce's practice of changing the rules mid-game is inherently unfair to petitioners as it forces them to speculate about when last minute corrections will be admitted and creates an incentive for respondents to hold off announcing mistakes, or even look for them, until the last minute."  (Pl.'s Pub. Br. at 30-31.)  Maui emphasizes that acceptance of the corrections undermines the statutory requirement that information must be submitted by the established deadline.  (*Id.* at 31.)

As to the imputed credit expenses accepted by Commerce, Maui maintains that the rate submitted by Dole does not represent Dole's creditworthiness.  (*Id.* at 32.)  Maui notes that *The Economist* lending rate listing indicated that the average prime lending rate in Canada was 6.50% while the average United States dollar prime rate was reported as 8.38%.  (*Id.*)  Maui points out that Dole had actual borrowings in the United States and that Dole's actual United States interest rate was lower than the average United States dollar prime rate.  (Pl.'s Prop. Br. at 32.)  Maui asserts that this difference in United States rates demonstrates that Dole is a "most favored" borrower that is qualified for lower interest rates.  (*Id.*)  Therefore, Maui posits that "[t]he average Canadian-dollar prime rate . . . that Dole selected is clearly higher than the rate Dole would actually have to pay" if Dole had actual borrowings in Canada.  (*Id.*)  Maui contends that Commerce did not address Maui's argument that the rate selected did not represent Dole's creditworthiness.  (Pl.'s Pub. Br. at 33-34.)  According to Maui, Commerce instead relied on Commerce's policy to use publicly available information (a policy that Maui states it did not challenge).  (*Id.*)  Maui disagrees with Defendant's interpretation of Commerce's role in the investigative process.  (Pl.'s Pub. Reply Br. at 22-23.)  Maui maintains that it is Commerce's obligation to take into account Dole's actual creditworthiness.  (Pl.'s Pub. Br. at 33-34.)  Maui

asks this Court to "direct Commerce to revise its calculations to substitute a Canadian dollar interest rate that is consistent with Dole's actual creditworthiness." (*Id.* at 34.)

Finally, Plaintiff points out that Commerce's final margin program contained a clerical error "whereby Commerce failed to properly convert Thailand-incurred inventory carrying costs (DINVCARU) on U.S. sales from Thai baht to U.S. dollars, due to improper use of parentheses." (*Id.* at 34.) Maui acknowledges that it failed to notify Commerce of the error but nevertheless asks the Court to direct Commerce to correct the error. (*Id.*) Maui argues that the incorrect programming language is as follows: [[

]]. (Pl.'s Prop. Br. at 35.) According to Maui, the correct language is:

[[                                                                                      ]]. (*Id.*)

Maui states that the addition of the internal parentheses is needed to convert inventory carrying costs from Thai baht to U.S. dollars. (*Id.*) Maui asserts that if the error alleged is corrected, then Dole's final dumping margin would rise above the *de minimis* level. (*Id.* at 34.) In response to Defendant's reliance on the exhaustion doctrine, Maui counters that "[t]his Court has directed Commerce to remedy its own clerical errors, notwithstanding the exhaustion doctrine, where the Court otherwise issues a remand to Commerce." (Pl.'s Pub. Reply Br. at 23-24 (citing *Serampore Indus. Pvt., Ltd. v. United States Dep't of Commerce*, 696 F. Supp. 665, 673 (Ct. Int'l Trade 1988)).) Plaintiff also lists various "mitigating factors" that it believes support correction of the error: (1) the correction is "uncontroversial and extremely simple"; (2) "other errors in Commerce's preliminary results programming masked the significance of this particular error"; and (3) the mistake is material in that correction would result in a non-*de minimis* margin. (*Id.* at 24-25.)

Plaintiff asks the Court to find that Commerce's determination in this case is unsupported by substantial evidence and to remand the case to Commerce.

II.     *Defendant's Contentions*

Defendant argues that Commerce's decision to accept the previously unreported military sales data was supported by substantial evidence and otherwise in accordance with law. (Def.'s Pub. Br. at 19.) According to Defendant, Dole "promptly" informed Commerce about the change in its military sales process and cooperated fully with Commerce's requests for information. (*Id.* at 19-20.) Defendant notes that pursuant to 19 C.F.R. § 351.301(b)(2) (2000), the deadline for submission of factual information to Commerce in this case was December 18, 2000. (*Id.* at 22.) Nevertheless, Defendant explains, an exception to the deadline established by § 351.301(b)(2) exists when information is requested by the verifying officials, in which case the information is due no later than seven days after the date when verification is completed. (*Id.*) Defendant cites its statement in the verification agendas that it "will accept new factual information" under certain circumstances and argues that this language "constituted a new, if limited, request for information." (*Id.* at 22-23.) As further support, Defendant points to 19 C.F.R. § 351.301(c)(2), which states that Commerce may request that a party submit factual information "at any time during a proceeding." (*Id.* (quoting 19 C.F.R. § 351.301(c)(2)).) Defendant therefore maintains that the military sales that Dole submitted at verification as "minor corrections" were not untimely. (*Id.* at 23.)

Defendant asserts that Commerce's policy of accepting minor corrections at verification is reasonable. (*Id.* at 26.) It remarks that Commerce has been given broad discretion in administering the antidumping laws, designating deadlines, and evaluating adequacy and

accuracy of submitted information. (*Id.*) Defendant characterizes Commerce's policy of accepting minor corrections as "a typical administrative procedure entrusted to Commerce's discretion." (*Id.* at 26-27.) Defendant argues that Maui's interpretation of the term "deadline" in 19 U.S.C. §§ 1677e(a)(2) and 1677m(e) is "inflexible and extreme" and "fails to accord proper deference to Commerce's reasonable interpretation of the statute and its own administrative procedures." (*Id.* at 27.) Defendant maintains that this Court has upheld Commerce's policy of accepting minor corrections. (*Id.* (citing *Coalition for the Pres. of Am. Brake Drum and Rotor Aftermarket Mfrs. v. United States*, 44 F. Supp. 2d 229, 235-37 (Ct. Int'l Trade 1999) ("*American Brake*")).) Defendant disputes Maui's assertion that Commerce has an established rule that the omission of a single U.S. sale is serious error. (*Id.* at 28.) Contrary to Maui's assertion, Defendant explains, the Court has sustained Commerce's case-by-case consideration of the facts in each review. (*Id.*) As to the *Florex* case relied upon by Maui, Defendant claims that in that case Commerce found that the respondent failed verification for various reasons and not solely because of the omission of a single sale. (*Id.* at 28-29 (citing *Florex*, 705 F. Supp. at 588).) Defendant maintains that the same holds true in the *Tatung* case and stresses that both of these cases predate the enactment of 19 U.S.C. § 1677m(e), which requires Commerce to consider data meeting the criteria in that provision. (*Id.* at 29 (citing *Tatung*, 18 Ct. Int'l Trade at 1140-42 & n.3).) Defendant responds to Maui's claim of inconsistent treatment of cases by Commerce by stating that Maui's claim "ignores the judgment that Commerce brings to bear in each case." (*Id.* at 30.) In response to the cases Maui cites in which the Court affirmed Commerce's rejection of a respondent's data, Defendant reasons that "Maui misunderstands the difference between what the prior judicial decisions permit and what they require. . . . A decision of this Court upholding

Commerce's determination in the context of another case that the failure to report or disclose some number of U.S. sales supported the use of 'facts available' does not establish a 'court imposed requirement.'" (*Id.*)

Defendant further argues that Commerce was correct in rejecting Maui's request to apply facts otherwise available rather than using the submitted sales. (*Id.* at 31.) Under 19 U.S.C. § 1677e(a)(2), Commerce may apply facts otherwise available where an interested party (1) withholds information that Commerce requested, (2) fails to provide requested information by applicable deadlines or in the form and manner requested, (3) significantly impedes a proceeding, or (4) the information submitted is unverifiable. 19 U.S.C. § 1677e(a)(2). According to Defendant, none of these criteria was met and therefore Commerce properly refused to use facts otherwise available. (Def.'s Pub. Br. at 31-32.) In particular, as to the second circumstance allowing use of facts otherwise available, Defendant offers that "the additional sales information constituted minor corrections to the comprehensive response data and were, thus, submitted within Commerce's deadlines." (*Id.* at 32.) Defendant insists that although the military sales were originally excluded, they were fully reported before the start of verification and therefore should not be considered "unreported sales." (*Id.*) Defendant states that "Maui's strict construction of the statute, which would preclude Commerce from accepting even minor corrections to submitted information 'under any circumstances,' is particularly inappropriate in the context of this case," where Maui does not dispute the accuracy of the information Dole submitted. (*Id.* at 33 (quoting Pl.'s Pub. Br. at 11).) Defendant believes that Commerce had no need or legal basis to use facts otherwise available because it had Dole's submissions. (*Id.* at 34.)

Defendant also disagrees with Maui's contention that Commerce should not have accepted Dole's corrections of the clerical errors as to product code 38900-72475. (*Id.*) Defendant points out that Maui was given an opportunity to comment on the acceptance of the corrections and cannot show prejudice from Commerce's acceptance and consideration of the corrected data. (*Id.*) According to Defendant, the errors caused the price of product code 38900-72475 to be understated by half when the sales were converted from the actual case format to the standard case format. (*Id.* at 35.) Defendant contends that Dole acted "promptly" in informing Commerce of the errors in its administrative rebuttal brief. (*Id.*) Defendant stresses that the errors were "inadvertent" and "unintentional" and had a "significant impact upon the calculated dumping margin," thus making Commerce's acceptance of the corrections proper. (*Id.* at 36.) Defendant presents case law emphasizing that "the goal of the antidumping law is to arrive at the most accurate results possible." (*Id.* at 37 (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990); *Keonig & Bauer-Albert AG v. United States*, 15 F. Supp. 2d 834, 848 (Ct. Int'l Trade 1998)).) Defendant responds that Maui's argument on this issue is contrary to *NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995). (*Id.*) According to Defendant, "[t]he court [in *NTN Bearing Corp.*] held that the important goal of finality could not justify Commerce's refusal to consider corrections brought to Commerce's attention well before the deadline for issuance of the final result of the review." (*Id.*) Defendant explains that the policy that Commerce set forth in *Colombian Flowers* was adopted in response to the decision in *NTN Bearing Corp.*, and that the objective of *Colombian Flowers* was to expand rather than restrict Commerce's ability to accept corrections of clerical errors. (*Id.* at 37-38.) Defendant concludes that "[t]he policy . . . does not restrict Commerce's discretion to consider . . .

corrections that meet all of the substantive requirements of the *Colombian Flowers* test and can be considered by Commerce within the statutory deadlines for completion of the administrative review. . . . Commerce retains the authority to relax a deadline or remove a restriction when it determines it can do so within the constraints of available resources and statutory deadlines." (*Id.* at 38-39 (citations omitted).)

With regard to the imputed credit expenses, Defendant states that Maui fails to demonstrate that Commerce's policy of accepting published data regarding actual foreign currency borrowing rates is unreasonable and does not provide any reason to question the reliability of the information submitted. (*Id.* at 40-41.) Defendant posits that Commerce's policy is a reasonable and practical methodology for calculating the imputed credit expenses where the antidumping statute does not specify any particular methodology or interest rate that should be applied. (*Id.*) Defendant states that "Commerce's policy does not contemplate further adjustments for asserted 'creditworthiness' comparisons for borrowing in another currency." (*Id.* at 42.)

Finally, Defendant argues that Maui's request to correct the clerical error in the final margin program should be rejected for failure to exhaust administrative remedies on this issue. (*Id.* at 42-44.) Defendant calls attention to Maui's failure to point out the error during the administrative proceeding or subsequent to the disclosure of the *Final Results* calculations. (*Id.* at 44.) In Defendant's view, Maui suggests that the time period for the error to be addressed was insufficient but does not show how it was insufficient. (*Id.* at 44-45.)

Defendant asks the Court to affirm Commerce's determination in the *Final Results* and dismiss the case. (*Id.* at 45.)

III.    *Defendant-Intervenors' Contentions*

Because this Court finds Dole's arguments in this matter substantially similar to those presented by Defendant, this Court will not recount them, although they have been duly considered.

STANDARD OF REVIEW

Commerce's determination will be upheld unless the Court finds that it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (internal quotations omitted). To be in accordance with law, Commerce's actions must be "reasonable under the terms of the relevant statute." *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 102 F. Supp. 2d 486, 489 (Ct. Int'l Trade 2000).

ANALYSIS

I.    *Commerce properly accepted Dole's submitted United States military sales data.*

Under Commerce's regulations, for the final results of an administrative review, factual information must be submitted no later than "140 days after the last day of the anniversary month." 19 C.F.R. § 351.301(b)(2) (2001). The anniversary month is the calendar month in which the anniversary of the date of publication of the order occurs. § 351.102(b). When

Commerce finds that a response does not comply with its request, it "shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of . . . reviews under this subtitle. If that person submits further information in response to such deficiency and . . . such response is not submitted within the applicable time limits, then [Commerce] may . . . disregard all or part of the original and subsequent responses." 19 U.S.C. § 1677m(d). Commerce may not refuse "to consider information that is submitted by an interested party and is necessary to the determination but does not meet all of the applicable requirements established by [Commerce] if -

(1) the information is submitted by the deadline established for its submission,

(2) the information can be verified,

(3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,

(4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by [Commerce] with respect to the information, and

(5) the information can be used without undue difficulties."

§ 1677m(e). Subject to 19 U.S.C. § 1677m(d), Commerce shall use facts otherwise available in reaching its determination if:

"(1) necessary information is not available on the record, or

(2) an interested party . . . -

(A) withholds information that has been requested . . .,

(B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to [19 U.S.C. §§ 1677m(c)(1) and (e)],

(C) significantly impedes a proceeding . . ., or

(D) provides such information but the information cannot be verified."

§ 1677e(a). As noted earlier, Commerce's verification agendas in this case contain its standard admonition to respondents that Commerce will accept new information only when "(1) the need for [the] information was not previously evident, (2) the information makes minor corrections to information already on the record, or (3) the information corroborates, supports, or clarifies information already on the record." (Jan. 23 Verification Agenda, at 2, Def.'s Pub. App. Ex. 11 at 2; Jan. 31 Verification Agenda, at 2, Def.'s Pub. App. Ex. 13 at 2.)

Using the criteria of 19 U.S.C. § 1677m(e), Commerce determined that it would accept the military sales data because (1) its stated policy allows respondents to make minor corrections at verification and therefore the submission was not untimely; (2) the information was verified; (3) there was no evidence at verification that the military sales data was incomplete; (4) there was no evidence at verification of Dole's lack of cooperation to the best of its ability; and (5) the information could be used without difficulty. *Decision Memo*, at 4-5, Def.'s Pub. App. Ex. 2 at 4-5. Commerce noted that its decision to accept the data at verification "is made on a case-by-case basis and depends on the significance of the new information. The military sales constitute a very small percentage of Dole's total U.S. sales." *Id.* at 4, Def.'s Pub. App. Ex. 2 at 4.

Commerce properly found that the military sales were acceptable as minor corrections to information already on the record. Dole submitted the military sales data during the earlier part

of verification. In fact, Commerce had sufficient time to verify the information and use it in the calculations of Dole's dumping margin. (Verification Report, at 28-29, 31, 41, Def.'s Prop. App. Ex. A at 28-29, 31, 41; "Analysis Memorandum for Dole Food Company, Dole Packaged Foods and Dole Thailand" (Apr. 2, 2001), at 4-5, Prop. Doc. 69, Def.'s Prop. App. Ex. G at 4-5.) This Court acknowledges that Commerce's ability to use facts otherwise available serves as an inducement for respondents to provide complete and accurate information in a timely manner. *See NTN Bearing Corp. of Am. v. United States*, No. 98-12-03232, 2003 Ct. Intl. Trade LEXIS 8, at *18 (Ct. Int'l Trade Jan. 24, 2003); *see also* Uruguay Round Agreements Act, Statement of Administrative Action, Pub. L. No. 103-465, 868-869, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4198 ("SAA"). The Court also acknowledges that due to deadlines and limited resources, "it is vital that accurate information be provided promptly to allow the agency sufficient time for review." *Tatung*, 18 Ct. Int'l Trade at 1140-41 (quoting *Ceramica Regiomontana, S.A. v. United States*, 636 F. Supp. 961, 967 (Ct. Int'l Trade 1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987)). At the same time, "Commerce enjoys very broad, although not unlimited, discretion with regard to the propriety of its use of facts available." *NTN Bearing Corp.*, 2003 Ct. Intl. Trade LEXIS 8, at *18. Commerce also has broad discretion to "fashion its own rules of administrative procedure, including the authority to establish and enforce time limits concerning the submission of written information and data." *American Brake*, 44 F. Supp. 2d at 237. Further, Commerce's determination as to whether a respondent has complied with its request for information is discretionary. *Allegheny Ludlum Corp. v. United States*, 215 F. Supp. 2d 1322, 1338 (Ct. Int'l Trade 2000) (quoting *Daido Corp. v. United States*, 893 F. Supp. 43, 49-50 (Ct. Int'l Trade 1995)).

In *American Brake*, the plaintiff challenged Commerce's decision not to apply facts otherwise available and Commerce's acceptance of information before and during verification. *American Brake*, 44 F. Supp. 2d at 235. The Court found the plaintiff's argument to be misplaced in light of the statement in Commerce's verification agenda that it would accept new information when the information makes minor corrections to or corroborates, supports, or clarifies information that is already on the record. *Id.* at 235-36. The Court found that Commerce's actions conformed with 19 U.S.C. § 1677m(d) (1994). *Id.* at 236.[5] The Court also rejected the plaintiff's argument that the quantity of incomplete answers required use of facts otherwise available, reasoning that Commerce has discretion in determining if a respondent has complied with an information request and if the errors substantially effect the integrity of the response. *Id.* Commerce had verified the respondent's submissions and determined that the revisions were not unduly extensive, and thus all errors were corrected and Commerce was able to calculate an accurate margin. *Id.* at 236-37.

As in *American Brake*, Commerce was able to verify the military sales data. At the time that the military sales were submitted to Commerce, Dole's United States sales were "already on

---

[5] The Court in *American Brake* cited the Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994, Annex II, which is implemented in the United States by the Uruguay Round Agreements Act of 1994. *American Brake*, 44 F. Supp. 2d at 234 & n.7, 236 n.12; *see also* SAA, Pub. L. No. 103-465, at 869, 1994 U.S.C.C.A.N. at 4198. Of relevance to the case before the Court is the statement in Annex II that "[e]ven though the information provided may not be ideal in all respects, this should not justify the authorities from disregarding it, provided the interested party has acted to the best of its ability." Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994, Annex II, Point 5. In the present case, Dole does not appear to have purposefully omitted the military sales from its United States sales database. When the omission was discovered, Dole acted promptly to submit the information and Commerce was able to verify it. Commerce therefore acted within the principles articulated in Annex II.

the record" in that Dole had already submitted its United States sales in its questionnaire responses. The military sales, which were a small percentage of all United States sales of the subject merchandise reported by Dole, corrected information that was already on the record in that the addition pf the military sales made the United States sales more accurate. As this Court has previously found, "the issue is not the value of the errors as a percentage of total U.S. sales, or the number of instances of errors. Rather the issue is the nature of the errors and their effect on the validity of the submission." *Tatung*, 18 Ct. Int'l Trade at 1141.

Maui questions Commerce's verification of Dole's military sales data, asserting that it "disagrees . . . that the limited, four-sentence review of four military sales out of over [[    ]] previously unreported sales means that those sales were 'verified.'" (Pl.'s Prop. Reply Br. at 12.) The Court, however, finds that Commerce properly verified the military sales. First, the figure that Maui puts forth is the total number of military sales made of the subject merchandise of both Thai and Philippine origin. (Verification Report, at Ex. U-18, Def.'s Prop. App. Ex. A1, Dole's Prop. App. Ex. 16.) The country of origin in this administrative review is Thailand and it is only with the Thai origin goods that Commerce was concerned. Second, Commerce has broad discretion is establishing verification procedures. *See Torrington Co. v. United States*, 146 F. Supp. 2d 845, 897-98 (Ct. Int'l Trade 2001); *Acciai Speciali Terni S.p.A. v. United States*, 142 F. Supp. 2d 969, 1007 (Ct. Int'l Trade 2001). As this Court observed in *FAG Kugelfischer Georg Schafer AG v. United States*, "verification is a spot check and is not intended to be an exhaustive examination of the respondent's business. Commerce has considerable latitude in picking and choosing which items it will examine in detail. In fact, Commerce enjoys wide latitude in its verification procedures. The Court defers to the agency's sensibility as to the depth of the

inquiry needed. In the absence of evidence in the record suggesting that the need to examine further the supporting evidence itself, the agency may accept the credibility of the document at face value. To conclude otherwise would leave every verification effort vulnerable to successive subsequent attacks, no matter how credible the evidence and no matter how burdensome on the agency further inquiry would be." *FAG Kugelfischer Georg Schafer AG v. United States*, 131 F. Supp. 2d 104, 133 (Ct. Int'l Trade 2001) (alterations in original omitted) (internal citations and quotations omitted); *see also U.S. Steel Group v. United States*, 22 Ct. Int'l Trade 104, 107 (1998) ("Verification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness. Normally, an audit entails selective examination rather than testing of an entire universe. Hence, evasion is a common possibility, but only when audits uncover facts indicating the actuality thereof are auditors compelled to search further.") (quoting *Bomont Indus. v. United States*, 733 F. Supp. 1507, 1508 (Ct. Int'l Trade 1990)). "Commerce is not required to verify every sale and invoice submitted." *Tatung,* 18 Ct. Int'l Trade at 1140 (holding that it is the respondent's burden to create an accurate record). In the present case, Commerce properly exercised its discretion in verifying four of Dole's submitted military sales. Third, though Maui seems to argue that more investigation of the military sales data was necessary for the data to be considered "verified," Maui does not challenge the completeness or accuracy of the information that Dole submitted.

Maui cites the *Florex* and *Tatung* cases for the proposition that the omission of even a single sale is considered a "serious error." These cases are distinguishable from the case before the Court and do not stand for the asserted proposition. In *Florex*, there were numerous errors and omissions, including the omission of "at least one U.S. sale." *Florex*, 705 F. Supp. at 587.

In that case, nearly half of the reported home market sales were inaccurately reported. *Id.* In light of the numerous errors and omissions in the responses, the Court found that Commerce was justified in finding a failure of verification. *Id.* In *Tatung*, the respondent's submissions contained errors as to commissions, sales expenses, and unit price, as well omissions of United States sales. *Tatung*, 18 Ct. Int'l Trade at 1140. In affirming Commerce's refusal to rely upon the respondent's submissions, the Court remarked that it is the respondent's burden to create an adequate record and that Commerce is not required to verify every sale to guarantee accuracy. *Id.* Neither of these cases involved Commerce's decision to refuse to use the respondent's submissions because of a single omission; in both cases Commerce was faced with a number of errors and omissions which led Commerce to believe that the totality of the information submitted was unreliable. *See Florex*, 705 F. Supp. at 587*; Tatung*, 18 Ct. Int'l Trade at 1140. Further, in the present case, Dole's response was not replete with errors and the military sales omissions did not make up a significant percentage of the total United States sales. Commerce was able to verify the information submitted and did not find errors in the submissions. Commerce acted reasonably in relying upon the information in calculating Dole's dumping margin.

Maui's reliance on *Reiner Brach* is also misplaced. In *Reiner Brach*, Commerce had requested that the respondent submit all home market sales of the foreign like product, which was defined as "merchandise that is sold in the foreign market and that is identical or similar to the subject merchandise." *Reiner Brach*, 206 F. Supp. 2d at 1330. The respondent's initial response to Commerce's questionnaire contained information regarding sales of identical merchandise, but it omitted sales of similar merchandise and some of the sales of identical

merchandise. *Id.* at 1330-31. Commerce sent a supplemental questionnaire in which it asked the respondent to explain the discrepancy between the questionnaire response and the respondent's submitted sales data. *Id.* at 1332. The respondent answered in vague terms that the figures in the questionnaire response were based on aggregate sales data while the figures in the data spreadsheets were based on individual invoices. *Id.* In light of this vague response, Commerce's inability to know of any further deficiency until verification, Commerce's admonitions that new information would not be accepted at verification, and the discretion given to Commerce, the Court found that Commerce properly refused to accept the respondent's data on sales of similar merchandise submitted at verification. *Id.* at 1334.

Unlike the respondent in *Reiner Brach*, Dole indicated to Commerce before verification that it had not submitted the military sales data based upon the 1995 order. (Dole's Section A Questionnaire Response, at A-26 to A-27, Def.'s Pub. App. Ex. 8 at 10-11; Dole's Sales Reconciliation Data, at Ex. R-18, Dole's Pub. App. Ex. 12 at 8-9.) When Commerce questioned Dole as to why Dole's databases have reported zero sales for a "significant number of observations," Dole clearly explained that the sales were "converted first to a standard case basis and then weighted by the shipment ratio reflecting the relative proportion of this product sourced from Thailand. For some products, which were sourced 100% from the Philippines and 0% from Thailand, the weighting fact is zero, and therefore the weighted quantity will be zero. Such transactions may be disregarded in the dumping analysis, as they constitute sales of non-subject merchandise." (Letter from Hale and Dorr LLP (on behalf of Dole) to U.S. Department of Commerce (Feb. 14, 2001), at 2, Pl.'s Pub. App. Ex. 13 at 2.) This explanation, as well Dole's explanation that the military sales were being omitted in light of the 1995 order, were not vague;

rather, they demonstrate that Dole acted to the best of its ability to submit the requested information. *See Decision Memo*, at 5, Def.'s Pub. App. Ex. 2 at 5. Additionally, the respondent in *Reiner Brach* failed to submit all of its sales data for similar merchandise; in the present case, however, Dole failed to submit military sales that made up only a small portion of all sales to be reported. Thus, *Reiner Brach* is also distinguishable.

For the reasons stated above, the Court finds that Commerce properly applied 19 U.S.C. § 1677m(e) in accepting the United States military sales data.

II.      *Commerce properly accepted Dole's corrections to the clerical error caused by conversion from actual cases sold to standard case equivalents.*

Maui challenges Commerce's acceptance of Dole's corrections of clerical errors as to product code 38900-72475 that occurred when Commerce asked Dole to convert its data from actual cases sold to standard case equivalents. As noted earlier, when Dole resubmitted its sales in standard case format, the number of cans per case for product code 38900-72475 was mistakenly listed as eight rather than four and the conversion factor to convert the actual case configuration of a 24-can, full-case equivalent was incorrectly indicated as 0.33. (Dole's Rebuttal Br., at 16, Dole's Pub. App. Ex. 19 at 21.) Maui claims that the acceptance of the corrections was contrary to the requirements in *Colombian Flowers* that the corrections be submitted at the earliest reasonable opportunity and that they be submitted no later than the respondent's administrative case brief. (Pl.'s Pub. Br. at 27-28.) Defendant maintains that Commerce acted in accordance with the objective of reaching the most accurate results possible. (Def.'s Pub. Br. at 37.) The Court holds that Commerce properly accepted the corrections of the

clerical errors as to product code 38900-72475.

In *Colombian Flowers*, Commerce indicated that it will "accept corrections of clerical errors under the following conditions: (1) The error in question must be demonstrated to be a clerical error, not a methodological error, an error in judgment, or a substantive error; (2) [Commerce] must be satisfied that the corrective documentation provided in support of the clerical error allegation is reliable; (3) the respondent must have availed itself of the earliest reasonable opportunity to correct the error; (4) the clerical error allegation, and any corrective documentation, must be submitted to [Commerce] no later than the due date for the respondent's administrative case brief; (5) the clerical error must not entail a substantial revision of the response; and (6) the respondent's corrective documentation must not contradict information previously determined to be accurate at verification." *Colombian Flowers*, 61 Fed. Reg. at 42,834.

In applying the *Colombian Flowers* criteria to the present case, Commerce found that (1) there was a clerical error, as opposed to a substantive error, (2) the corrected database was reliable, (3) "[b]ecause Dole did not realize that it had made an error until [Maui's] allegation called [Dole's] attention to certain high-margin sales, its rebuttal brief was the earliest opportunity to correct the error," (4) the corrections were not a substantial revision in light of the small number of sales to be corrected, and (5) the corrected data did not contradict information presented at verification. *Decision Memo*, at 13, Def.'s Pub. App. Ex. 2 at 13.

By accepting the corrections, Commerce avoided the use of a high dumping margin and was able to obtain an accurate gross unit price for the merchandise sold. This Court, as well as the U.S. Court of Appeals for the Federal Circuit ("CAFC"), has repeatedly stated that

Commerce must determine dumping margins as accurately as possible and that the antidumping laws are remedial, not punitive. *Viraj Group, Ltd. v. United States*, 193 F. Supp. 2d 1331, 1336 n.1 (Ct. Int'l Trade 2002) (discussing various decisions of the CAFC and this Court). The potential tension between finality and correct results has been acknowledged, but "preliminary determinations are 'preliminary' precisely because they are subject to change" and the tension between finality and correctness does not exist when corrections are submitted after preliminary determinations. *NTN Bearing Corp.*, 74 F.3d at 1208; *see also World Finer Foods, Inc. v. United States*, No. 99-03-00138, 2000 Ct. Intl. Trade LEXIS 72, at *29 (Ct. Int'l Trade June 26, 2000). The criteria of *Colombian Flowers* were established in response to the CAFC's decision in *NTN Bearing Corp.*, where the CAFC stated that it did "not agree that draconian penalties are appropriate for the making of clerical errors in order to insure submission of proper data. Clerical errors are by their nature not errors in judgment but merely inadvertencies. While the parties must exercise care in their submissions, it is unreasonable to require perfection." *NTN Bearing Corp.*, 74 F. 3d at 1208; *Colombian Flowers*, 64 Fed. Reg. at 42,834.

The Court's decision in *World Finer Foods* also provides guidance on this issue. In that case, the respondent attempted to submit corrections to its database after the preliminary results were issued. *World Finer Foods, Inc.*, 2000 Ct. Intl. Trade 72, at *23. Commerce rejected the submission on the grounds that it was an untimely submission of new factual information which did not comply with the *Colombian Flowers* criteria that the corrective documentation be reliable and that it be submitted by the due date for the respondent's case brief. *Id.* at *23, *24 n.16. The Court found that the submission was a correction to a clerical error rather than new factual information and that Commerce did not demonstrate that the information was unreliable. *Id.* at

*26-27. Relying upon *NTN Bearing Corp.*, the Court found that Commerce improperly treated the submission as untimely and violated the notion that dumping margins are to be determined as accurately as possible. *Id.* at *27-28. The Court observed that the respondent had been fully cooperative in the administrative review and that making the correction imposed little burden on Commerce. *Id.* at *28-29.

Similarly, Dole acted cooperatively in submitting information to Commerce, complying with Commerce's instructions to convert the sales data from actual cases sold to standard case equivalents. The errors were inadvertent and effected a single product code in the sales data submitted. Additionally, Commerce was able to make the corrections without difficulty and calculate an accurate dumping margin. "Use of the mistakenly submitted information would be punitive" to Dole, and the simple corrections were in accordance with the principle that the antidumping laws are remedial rather than punitive in nature. *Id.* at *29. As noted earlier, Commerce has discretion in establishing its administrative procedures and enforcing time limits for submitting information. *American Brake*, 44 F. Supp. 2d at 237. The Court holds that Commerce's acceptance of the corrections of the clerical errors was a reasonable exercise of its discretion.

III.     *The issues raised as to Commerce's calculation of Dole's imputed credit expenses are remanded for further consideration.*

Commerce explains its use of imputed credit expenses in calculating normal value in Import Administration Policy Bulletin 98.2. *Import Administration Policy Bulletin 98.2: Imputed credit expenses and interest rates* (Feb. 23, 1998), Def.'s Pub. App. Ex. 17 ("*Policy*

*Bulletin 98.2*"). In that policy bulletin, Commerce explains that it "makes a circumstances of sale adjustment to normal value (NV) to account for differences in credit terms. To make this adjustment, [Commerce] imputes a U.S. credit expense and a foreign market credit expense on each sale." *Policy Bulletin 98.2*, at 1, Def.'s Pub. App. Ex. 17 at 1; *see supra* note 2. According to the policy bulletin, "[i]n cases where a respondent has no short-term borrowings in the currency of the transaction, [Commerce] will use publicly available information to establish a short-term interest rate applicable to the currency of the transaction. For foreign currency transactions, [Commerce] will establish interest rates on a case-by-case basis using publicly available information, with a preference for published average short-term lending rates." *Id.* at 6, Def.'s Pub. App. Ex. 17 at 6. The imputed credit expense "must correspond to a dollar figure reasonably calculated to account for [the time value of money] during the gap period between delivery and payment. If the cost of credit is imputed in the first instance to conform with commercial reality, it must be imputed on the basis of usual and reasonable commercial behavior." *LMI-La Metalli Industriale, S.p.A. v. United States*, 912 F.2d 455, 460-61 (Fed. Cir. 1990). As noted by Defendant, there is no statutory guidance as to how imputed credit expenses should be calculated or what interest rate should be applied. (Def.'s Pub. Br. at 41.) After the CAFC's decision in *LMI-La Metalli Industriale, S.p.A.*, Commerce sought to develop a policy such that the interest rate used would reflect the "commercial reality" in a given case. *See Policy Bulletin 98.2*, at 2-5, Def.'s Pub. App. Ex. 17 at 2-5. Commerce noted that "[i]n the case of foreign market sales, it is not possible to develop a single consistent policy for selecting a surrogate interest rate when a respondent has no short-term borrowings in the currency of the transaction. The nature of the available information will vary from market to market. However,

any short-term interest rate used should . . . be reasonable, readily available, and representative of 'usual commercial behavior.'" *Id.* at 5.

Maui does not question the propriety of Commerce's policy of using publicly available information when there is no short-term borrowing rate. (Pl.'s Pub. Br. at 33; Pl.'s Pub. Reply Br. at 22.) Rather, Maui argues that Commerce should have investigated whether the interest rate submitted was reflective of Dole's creditworthiness. (*Id.*) In the *Final Results* and the *Decision Memo*, Commerce does not address the argument raised by Maui as to whether the interest rate chosen is reflective of Dole's creditworthiness. Commerce simply states that it is following its policy, as articulated in *Policy Bulletin 98.2*, of using publicly available information to establish the rate to be used. *Decision Memo*, at 7 & n.12, Def.'s Pub. App. Ex. 2 at 7. In light of the CAFC's mandate and Commerce's policy that the rate chosen must reflect "commercial reality" and "usual and reasonable commercial behavior," and Commerce's failure to address Maui's concerns that the rate chosen in this case does not reflect Dole's creditworthiness, the Court remands this issue so that Commerce may more adequately address Maui's arguments and explain how the rate chosen is reflective of Dole's "usual and reasonable commercial behavior."

IV.    *The issues raised as to the existence of a clerical error in Commerce's final margin program language are remanded for further consideration.*

Maui has identified a clerical error in Commerce's final margin program language the correction of which Maui maintains will cause Dole's final dumping margin to rise above the *de minimis* level. As discussed earlier, Maui argues that the incorrect programming language is as

follows: [[                                                                                                       ]].

(Pl.'s Prop. Br. at 35.)  According to Maui, the correct language is: [[

]].  (*Id.*)  Defendant and Dole counter that

this alleged error, which was not raised during the administrative review, should not be

considered by the Court because Maui failed to exhaust administrative remedies.  The Court

remands the issue to Commerce for further consideration.

Under 28 U.S.C. § 2637(d) (2000), in any civil action not specified in subsections (a)

through (c), this Court "shall, *where appropriate*, require the exhaustion of administrative

remedies."  28 U.S.C. § 2637(d) (emphasis added).  "Nevertheless, the Court may exercise its

discretion to prevent knowingly affirming a determination with errors."  *Torrington Co. v. United*

*States*, 21 Ct. Int'l Trade 1079, 1082 (1997).  In *Serampore Industries*, the plaintiff raised

computer input errors for the first time before this Court and requested a remand for correction of

the errors.  *Serampore Indus. Pvt. Ltd. v. United States Dep't of Commerce*, 696 F. Supp. 665,

673 (Ct. Int'l Trade 1988).  In light of its decision to remand for consideration of another issue,

the Court also agreed to remand for consideration of whether there was an error and for

correction if necessary.  *Id.*  In the present case, the Court is remanding this case to Commerce

for consideration of Maui's arguments regarding Dole's imputed credit expenses.  Requiring

Maui to exhaust its administrative remedies would not be appropriate in this case.  Rather than

"affirm a determination that might be based on a questionable record," the Court remands this

issue to Commerce to determine whether there is an error in the final margin program language.

*Id.*  If Commerce finds that there is an error, Commerce is directed to make the appropriate

corrections.

CONCLUSION

The Court finds that Commerce's decision to accept the United States military sales data and the corrections to a clerical error was supported by substantial evidence or otherwise in accordance with law. The Court remands to Commerce (1) to consider Maui's arguments as to the interest rate used for Dole's imputed credit expense and explain how the rate chosen is consistent with *LMI-La Metalli Industriale, S.p.A. v. United States*, 912 F.2d 455 (Fed. Cir. 1993) and *Policy Bulletin 98.2*, and (2) to determine whether there is a clerical error in Commerce's final margin program and make any necessary corrections. Plaintiff's motion for oral argument is denied.

_____
Gregory W. Carman
Chief Judge

Dated: April 16, 2003
New York, New York